Booth, Chief Justice,
delivered the opinion of the court:
The petition in this case discloses a suit to recover under the act of June 25, 1910 (86 Stat. 851), as amended by the act of July 1, 1918 (40 Stat. 705), for the infringement by the Government of a patented device. The plaintiff acquired title to the patent from the inventor, Frederick W. Midgley, who assigned the same to plaintiff while his application was still pending in the Patent Office. The patent, #1018769, was granted plaintiff on February 25,1911. The issue now before the court is the. validity of the patent if valid infringement is conceded. We say this because the Government’s brief discusses no issue other than validity of the patent.
The invention involved is a wave meter, and plaintiff relies upon claims 4 and 5 to sustain his case. We quote the claims from the patent as follows:
“ 4. A wave meter comprising a condenser and inductance forming an oscillating circuit, and a self-restoring detector having unipolar connection with said oscillating circuit.
“ 5. A wave meter comprising a condenser and inductance forming an oscillating circuit, a self-restoring detector having unipolar connection with said oscillating circuit, and a signal translating instrument having its terminals connected to the terminals of said detector device.”
Wave meters as such are not new. As its name implies, it is an electrical device for measuring the frequency of oscillations, such as are employed in wireless telegraphy or telephony. The primary objects of attainment in such a device are accuracy, availability, and simplicity. The inventor in this case was seeking to improve existing devices by constructing a compact meter, comparatively small and light, considering its range, which would obviate interchangeable *138 or removable inductance windings or coils used therein. To accomplish the purpose the inventor employed the adopted elements of the art except in one particular, and it is the ingenious and novel way in which he overcame the difficulties of existing arrangements that brought forth a wave meter acknowledged to be an improvement over those that had gone before.
Stated as plainly as possible, a wave meter is designed to accomplish the measurement of waves broadcasted into the air as in radio, wireless telegraphy or telephony. To accomplish this an electrical device composed of a calibrated circuit possessing both inductance and capacity is essential, either or both of which may be varied. This instrument, when placed with reference to a transmitting or generating oscillating circuit in which a high frequency current is flowing, absorbs a portion of the radiant energy coming therefrom, and a current will be set up and induced into the calibrated circuit. The patentee accomplished the above by means of the inductance coils and adjustable condenser in circuit as disclosed by the following figure taken from his letters patent:

The novelty which the inventor conceived with reference to Fig. 2 resides in the way in which he translated the means of ascertaining the presence and value of the current flow within the wave meter itself, i. e., by employing a detector or wave-responsive device — a common one used is illustrated in a receiving radio set where a crystal serves *139 this purpose — which was not included either in shunt or series with the oscillating circuit illustrated in Fig. 2, i. e., only one terminal of the crystal or other suitable detector “ is in electrical communication with the oscillating circuit, the other terminal of the detector being free or unconnected, so far as the oscillating circuit is concerned, and that the telephone or other instrument T is connected to the terminals of the detector W.” Fig. 4 taken from the patent illustrates a diagrammatic view of the device.

This is what is known as a unipolar connection and is no more nor less than a means of translating the knowledge of the presence and value of the current flow in the calibrated receiving set, and its predominating novelty resides in the ability to receive such translation from a device wherein the detector is connected with the oscillating circuit in unipolar fashion. “ W ” represents the detector, and the unipolar connection is the single wire leading from the oscillating circuit to 46. The utility of this novel connection and its distinct value in the art are found in the fact that a unipolar connection of the detector with the oscillating circuit maintains the persistency of the oscillating circuit by deriving therefrom a minimum of energy and thus permitting the oscillating circuit to respond to a sharper and more accurate resonance or tuning, attaining the final result of more accurate measurements of wave lengths and frequency. To function with a maximum of proficiency it is a recognized necessity to so connect the detector with the oscillating circuit as to abstract from the *140 oscillating circuit a minimum of energy and thus secure the desired objective of sharper and more pronounced resonance or maximum energy. This feature of the device in suit is without question obtained in the patentee’s unipolar connections.
The issue raised as to novelty is not made dependent upon the result, but upon the obtaining of precisely similar results in preexisting devices upon a similar scientific basis. The defendant challenges the validity of the patent, not alone upon prior art, but upon an alleged demonstrable scientific principle that unipolar connections in fact are nonexistent in the plaintiff’s device, and if relied upon are scientifically inoperative. The conceptions of prior inventors in the art without exception disclose a failure to employ a unipolar connection with reference to the oscillating circuit, i. e., the energy from the oscillating circuit was translated by the detector either in series or shunt connection. The defendant, as we apprehend the contention, insists that a completed circuit is a scientific necessity if the device is to operate, and that the construction relied upon in this case acquires a completed circuit including the detector with the oscillating circuit because the elements of the detector possess a capacity relationship with the adjacent portions of the wave-meter structure, and through such capacity relationship a return circuit is formed with the unattached terminal of the detector. In other words, the unipolar connection with the oscillating circuit is not from a scientific viewpoint unipolar, but multiple because the relationship between the detector and the oscillating circuit enables electric energy to span the space left open by the unipolar connection, thereby completing, without physical structure, the scientifically required circuit. The necessity for establishing a capacity return from the free terminal of the detector back to the oscillating circuit of the wave meter resides in the prior art exhibits, for, as to be hereafter discussed, prior inventors had not conceived the possibility of a. functioning device predicated upon unipolar connection.
Whatever of merit attaches to the above defense, it is to be noted that to sustain it recourse must be had to existing *141 patents and they in part reconstructed from knowledge imparted by the challenged patent in order to ascertain similarity and anticipation. The following cases cited by the plaintiff are apropos: Sewall v. Jones, 91 U. S. 171; Bates v. Coe, 98 U. S. 31. As repeatedly observed in numerous decisions of the courts in patent cases, “ after a thing has been accomplished it is not difficult to ascribe reasons for a failure to anticipate it.”
Much reliance is placed upon the prior patents to Shoemaker. The condenser C, shown in Fig. 4 of the Shoemaker patent, is a concrete and tangible piece of electrical apparatus. It is referred to on page 2 of the patent as follows:
“With the intervening condenser C of suitable capacity the region of maximum response is very sharply defined * * *.”
The test here is one of interpretation. Would the man skilled in the art, upon reading the Shoemaker disclosure, be led to omit the condenser C, together with its respective connections to the detector and to the inductance, and thereby obtain the beneficial results flowing through such omission and which have been adequately proved? We think not. We are assisted in arriving at this decision from the history of the proceedings in the Patent Office. As set forth in Finding VII, the examiner of the Patent Office queried the operation of the detector by means of a unipolar' connection, and stated that “it is not seen how there would be any current flowing through the detector and telephone.” If the opera-tiveness of the unipolar connection was not apparent to the Patent Office examiner, whose routine daily duty involved the constant study of intricate electrical inventions, it seems clear that the omission of the condenser C of the Shoemaker patent, together with its connecting wires between the inductance and the detector', would not be obvious to the mechanic skilled in this particular art. We therefore do not believe that the Shoemaker patent either directly or indirectly teaches the use of the invention at issue.
The British patent to Shoemaker discloses in Fig. 8 a radio receiving circuit comprising a loop antenna grounded at both of its ends through variable inductance coils. There is a second inductance connected to one of these leg indue- *142 tances by means of a single wire or unipolar connection. This second inductance is bridged by a circuit having a detector and capacity in series, the detector actuating a telephone to render audible oscillating currents set up in the receiving antenna and impressed upon the inductance, which is connected thereto by the unipolar' connection. The detector circuit is substantially similar to that shown in the patent to Shoemaker, #932819, which has been discussed, supra, in that one terminal of the detector is connected to one end of the inductance and the other terminal of the detector is connected to a variable point of the inductance through a series condenser or capacity.
While the unipolar connection exists between the antenna and the slider inductance, we find the detector' circuit a complete one involving a tangible and concrete condenser element, and what has been said with reference to the Shoemaker patent #932819, relative to the omission of the condenser and its connections, applies with equal force and effect.
The citation from “ Electric Waves,” by Hertz, discloses an induction coil with its secondary terminals connected to a spark gap which, when operated, will produce radiant energy or electric waves. One side of this spark gap is connected by means of a single wire or unipolar connection to an oscillating circuit comprised of a single rectangular loop of wire. In order to detect electrical oscillations in this oscillating circuit a minute spark gap is left, which functions as a visual detector. This spark gap, if it can be properly termed a “ detector,” is in series with the oscillating circuit and no unipolar connection of a detector is accordingly suggested.
The reason for the citation of the patent to Donitz, #163164, is not apparent, unless it is for the purpose of showing that wave meters, per se, employing an oscillating circuit having inductance and capacity were old and well-known devices. This patent discloses a type of hot wire ammeter or thermal indicator for visually indicating the current flow in the oscillating circuit and in no way suggests or discloses any unipolar connection between the oscillating circuit and the detector.
*143 The Stone patent, #714831, relates to a receiving circuit for radio signals and discloses a closed oscillating circuit which possesses capacity and inductance in series. The device for detecting the current flow in this oscillating circuit comprises what is known as a coherer and this is connected across one of the condensers in the oscillating circuit; that is to say, one of the terminals of the coherer is directly connected to one side of the condenser and the other terminal of the coherer is directly connected to the other side of the ■condenser. The purpose of such connection is stated to be to impress a maximum potential difference upon the coherer ■or detecting device. This is the direct antithesis of the structure called for by the claims in suit, in which but one terminal of the detector is connected through a unipolar connection for the purpose of supplying to the detector a mmwm amount of energy rather than a maximum. There is, therefore, no disclosure in this patent in any way indicating the unipolar or single connection and the consequent advantages flowing therefrom.
We are unable to find anticipation; there is nothing in the prior art which approaches plaintiff’s construction, and, in our view of the record, plaintiff did succeed in bringing into being a decidedly new and novel improvement in the way of constructing wave meters. The Government has recognized the utility of the principles embodied in the patent in suit. The Bureau of Standards, Department of Commerce, in Bulletin #74 dated March 23, 1918, entitled “ Radio Instruments and Measurements,” at page 105, states:
“When the source [of oscillations to be measured] supplies only a small amount of power, it is necessary to use a sensitive indicator, such as a crystal detector and phones. [Midgley shows these in his patent.] When such a detecting circuit is connected or coupled to the wave-meter circuit, the wave-length calibration and the resistance of the wave-meter will be changed somewhat, depending upon the type of detecting circuit. The changes will also depend to some extent upon the adjustment of the crystal contact, so that it is important in the design of a wave meter to choose a detecting circuit which will least affect the 'wave-meter constants.” {Brackets and italics ours.)
*144 The patentee, it seems to us, undoubtedly did conceive the prime necessity “ of a detecting circuit which will least affect the wave-meter constants,” and by a unique and novel construction create a device which admittedly accomplishes the desired end. In this respect, his contribution to the art is entitled to distinct recognition, and, in our judgment, his claims are valid. Infringement is conceded. The case, as per agreement, will be remanded to the general docket with leave granted to take proof as to damages. It is so ordered.
Williams, Judge/ LittletoN, Judge; and GkeeN, Judge, concur.